IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 12, 2016

## STATE OF TENNESSEE v. ADAM CHRISTOPHER BUTLER

**Appeal from the Circuit Court for Madison County**
**No. 15-124    Roy B. Morgan, Jr., Judge**

_____

**No.  W2015-01843-CCA-R3-CD  -  Filed June 8, 2016**

_____

The Defendant, Adam Christopher Butler, was convicted by a Madison County Circuit Court jury of vandalism of property valued at $1000 or more.  *See* T.C.A. § 39-14-408 (2014) (amended 2015).  The trial court sentenced the Defendant to an effective four years on community corrections.  On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction and (2) the trial court erred in excluding testimony relative to the victim's accusations against another person.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J. joined.

George Morton Googe, District Public Defender; Jeremy B. Epperson, Assistant Public Defender, for the appellant, Adam Christopher Butler.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Jerry Woodall, District Attorney General; and Rolf G.S. Hazlehurst, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from an incident in which the victim's plants were damaged.  At the trial, the victim testified that the Defendant was her neighbor and that on July 26, 2014, she awoke around 1:45 a.m., looked at a security camera monitor located in her bedroom, and saw the Defendant walking in her backyard.  She stated that she went outside and approached the Defendant, that she saw him spraying her plants, and that he noticed her, left her yard, and went behind another neighbor's bushes.  The victim said

that the Defendant wore a "canister sprayer" on his back and had a nozzle in his hand. The victim said that she stood in her backyard and that eventually, the Defendant returned. The victim stated that the Defendant told her the next door neighbor had hired him to spray for mosquitoes. The victim said she told the Defendant, "Why are you in my yard? I didn't hire you to spray anything." She stated that the Defendant denied spraying her plants, that they spoke for six or seven minutes, and that she returned to her house. She said that the Defendant did not have permission to be on her property.

The victim acknowledged a surveillance video recording, which was played for the jury. The victim identified four photographs taken before the incident, which were received as exhibits. The photographs showed the victim's backyard, which was landscaped with healthy flowers, shrubs, and trees.

The victim testified that about one week after the incident, she noticed her landscaping was "extremely damaged" and that eventually, most of her plants died. The victim identified five photographs of the damaged plants. The photographs showed large brown sections in several of the plants and dead grass in front of the plants. The victim stated that some of the photographs of the damaged plants were taken about ten days after the incident and that the remainder were taken "a little bit later." The victim valued the damage at more than $2000.

On cross-examination, the victim testified that the recording depicted the Defendant walking away from the victim and toward his property. She acknowledged, though, that the recording shown in court did not show the Defendant's walking away because the lighting was poor. The victim said that the recording presented in court was made from a cell phone recording of the surveillance recording and that the original recording showed the silhouette of a person moving in the back of the yard.

The victim testified that she took the photographs of her yard before the incident. She stated that she filed a police report in connection to the incident and that she had filed previous police reports complaining of someone spraying poison on her plants. When asked why the police report in the present case specified damage to plants in both the front and back yards, the victim responded that plants in her front yard were damaged in a previous incident and that she did not know why the officer included those plants in the report. She acknowledged that the police report stated the amount of damage was less than $2000 but said that the police report was filed before she obtained an estimate to replace the plants from a landscaping company.

The victim acknowledged that before 2014, she had an issue with the zoning commission regarding a fence on her property, which she removed at the commission's order. She did not recall the Defendant' opposing her building the fence and said he had stated at the time that he "didn't have any problem with" her.

On redirect examination, the victim testified that she did not write the police report and agreed the report reflected that when she confronted the Defendant, he said he was spraying for mosquitoes and that dead vegetation was found in both the front and back yards. The victim said, though, that she only saw the Defendant in her backyard. She stated that she spoke to a police officer about the July 26 incident and that the officer prepared the police report at a later date.

Jackson Police Investigator Gerald Robert Bielke testified that he was assigned the victim's case. He said that Officer Harvey Wyatt wrote the initial police report based upon the victim's statement to Officer Wyatt and that based upon the information in the report, Investigator Bielke issued the arrest warrant. Investigator Bielke stated that he prepared a supplement to the police report based upon his conversation with the victim.

On cross-examination, Investigator Bielke testified that the warrant was "only pertaining to that single event." He said he understood the July 26 incident involved spraying the backyard but acknowledged that the warrant reflected both the front and back yards were sprayed on July 26. Investigator Bielke said that the victim did not report seeing the Defendant in her front yard and that the victim later discovered damage in the front yard.

Rodney Butler, the Defendant's father, testified that he was aware of the accusations against the Defendant. Mr. Butler identified photographs he took in August 2014, about one week after the Defendant's arrest. He said the photographs depicted the victim's and the next door neighbor's yards, including a tall hedge on the border between the victim's and the next door neighbor's backyards. Mr. Butler said that the neighbor had a stroke the year before the incident and had asked the Defendant to spray poison ivy in his yard. Mr. Butler stated that the poison ivy spray did not kill other plants.

The photographs were received as exhibits and showed the victim's driveway, landscaping in the front yard, multiple angles of the hedge, and the backyard. Mr. Butler testified that he did not see any damage to the vegetation in front of the victim's house and that he saw naturally occurring "white stuff" on the grass. Mr. Butler said that the hedge showed where the Defendant had sprayed the poison ivy and stopped before reaching the victim's yard. He noted the photographs showed that the hedge was green and that the poison ivy was dead.

Mr. Butler testified that he had performed yard work for thirty years, that he had experience mulching, planting and pulling flowers, pulling weeds, and cutting lawns, and that he had worked in many yards, although he was not a licensed professional. He said that he had cut the same type of grass the victim had in her yard and that "when this kind of grass gets shaded out in hot weather, it'll turn sort of grayish." He stated that the victim's "shrubbery hasn't been taken care of the way it ought to be." He said that the victim had put rocks in her flower beds and that rocks became hot during the summer

months and affected the surrounding plants. He stated that as a result, the tips of the grass became brown and that he did not think flowers would survive.

On cross-examination, Mr. Butler testified that Roundup would kill almost any plant. He said that when he took the photographs, he was on the next door neighbor's property and denied going onto the victim's property. He identified no trespassing and private property signs on the victim's property.

The Defendant testified that the victim lived across the street from him and that he performed yard work for the victim's next door neighbor. He said that the next door neighbor paid him $200 annually to kill poison oak located in the hedge. He stated that he used salt water to kill the poison oak and acknowledged that he began working on the hedges on July 26, 2014, at 1:45 a.m. The Defendant said that he spoke with the victim, finished spraying the next door neighbor's hedge, and went home. He stated that he told the victim he had not been in her yard because he knew "people have messed up her yard, and she's had problems before" and because he did not want the victim to think he was responsible.

The Defendant testified that he sprayed the hedge during the night because he wanted the spray to begin working before he worked on the hedge the next day. He stated that he used a backpack sprayer. When asked what working on the hedge entailed, he stated that he would "watch and see" if the spray took effect. The Defendant denied entering the victim's yard on July 26 or spraying her plants and denied being on the victim's property except when she asked him to "do some stuff for her" when she moved into her home.

The Defendant testified that he believed he had previously been diagnosed with attention deficit hyperactivity disorder (ADHD) but that he did not think he had it. He said his ADHD could affect his appearance and ability to communicate, and he later said he did not think ADHD interfered with his memory of the incident.

The Defendant testified that he was the person in the surveillance video recording and that he did not enter the victim's property. He acknowledged that no proof showed the next door neighbor had hired him. When asked whether salt water would kill plants other than poison ivy or poison oak, the Defendant said "[t]here was a lot of privet . . . which it wouldn't even have mattered [because] they wanted it cut down." He stated that the next door neighbor only wanted him to kill the poison oak. He said that he used a flashlight application on his cell phone to see the poison oak. When asked why he was working at night, the Defendant responded, "There's a restaurant that I did for 13 years or so, and they preferred me to do it at night 'cause I don't want to hit . . . cars with rocks[.]" When asked how he could hit cars with rocks while using a sprayer, the Defendant responded, "[S]ome people prefer late at that time to be able to do like third shift work at a factory. They go in that late." When asked whether the next door neighbor told him to

work at night, the Defendant said he worked on the hedges the year before and did not have a problem with the victim. The Defendant denied telling the victim he was spraying for mosquitoes. The Defendant denied vandalizing the victim's grass and bushes.

The Defendant testified that in the course of his yard work, he used string trimmers and lawnmowers, which could throw rocks, and that some people who hired him to do yard work wanted him to work at night. The Defendant stated that salt water was used to kill "outline, edging, stuff that you don't want to" cut with a string trimmer.

Upon this evidence, the Defendant was convicted of vandalism. This appeal followed.

## I. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction, arguing that the victim's testimony was not supported by the evidence because the surveillance video recording did not show the Defendant spraying the victim's property. He also argues that the victim's testimony was inconsistent because she initially reported the damage as less than $2000 but later amended the amount. The State responds that the evidence is sufficient.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Vandalism is defined as knowingly causing "damage to or the destruction of any real or personal property of another . . . knowing that the person does not have the owner's effective consent." T.C.A. § 39-14-408(b)(1).

In the light most favorable to the State, the record reflects that the victim saw the Defendant on her property at 1:45 a.m., that she confronted him at her property line, that the Defendant wore a backpack sprayer, and that the victim saw the Defendant spray her plants. The victim testified that the recording showed the Defendant walking away from her, the Defendant's speaking to the victim, and the victim's returning to her home. The victim said that she had not hired the Defendant to spray her plants and that he did not have permission to be on her property. We note that although the quality of the video recording was poor, the Defendant acknowledged he was the man depicted in the recording and said he was wearing a backpack sprayer. The jury by its verdict credited the victim's testimony and resolved any conflicts in the evidence in the State's favor. The evidence is sufficient. The Defendant is not entitled to relief on this basis.

## II. Excluded Evidence of Victim's Allegations against Ms. Beasley

At the trial, the Defendant sought to cross-examine the victim and present Debra Beasley, another of the victim's neighbors, as a witness regarding the victim's vandalism allegations against Ms. Beasley. The Defendant argued that the evidence was admissible under Tennessee Rule of Evidence 608(b) as proof of the victim's character for untruthfulness. The trial court held a jury-out hearing and excluded the evidence of the victim's allegations against Ms. Beasley.

On appeal, the Defendant contends that the trial court erred by excluding Ms. Beasley's testimony and prohibiting the Defendant from cross-examining the victim about the incident.[1] The State responds that the trial court correctly excluded the testimony because the evidence was irrelevant and had no probative value and, alternatively, that any error was harmless.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

Tennessee Rule of Evidence 608(b) states, in relevant part, that

[s]pecific instances of conduct of a witness for the purpose of attacking . . . the witness's character for truthfulness, other than convictions of crime as

---

[1] We note that appellate counsel did not elaborate on the reasoning behind his contention or provide the applicable standard of review. *See* T.R.A.P. 27(b)(7).

provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness . . . . The conditions which must be satisfied before allowing inquiry on cross-examination about such conduct probative solely of truthfulness or untruthfulness are:

(1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry; [and]

(2) the conduct must have occurred no more than ten years before commencement of the action or prosecution[.]

### *Rule 608(b) hearing*

In a jury-out hearing, the victim testified that she had reported Ms. Beasley to the police between 2010 and 2011 for damaging the victim's lawn ornaments and poisoning her yard. The victim said that Ms. Beasley dropped chemicals onto her grass and that seven days later, the grass began to die. The victim stated that she had a recording on her cell phone of Ms. Beasley's kicking her lawn ornament. The victim said that the police did not take further action and that although she had surveillance video recordings of Ms. Beasley, the police were uninterested in reviewing them. She stated that Ms. Beasley had opposed the construction of the victim's fence.

Debra Beasley testified that the victim had previously accused her of damaging the victim's lawn and lawn ornaments. Ms. Beasley said that the police asked her to explain a video recording in which Ms. Beasley "flipped" lawn ornaments into the victim's yard using her toe. Ms. Beasley stated that the victim had placed the ornaments on concrete edging between their properties and that the ornaments had fallen into Ms. Beasley's yard due to the wind. Ms. Beasley said that she waited for the victim to pick up the ornaments, but that Ms. Beasley put them back in the victim's yard when the victim did not. Ms. Beasley stated that she gave the officers a written statement and that the officers dismissed the complaint. Ms. Beasley denied vandalizing the victim's property or going onto the victim's property.

Ms. Beasley testified that in the same police report, the victim accused her of poisoning the victim's lawn. Ms. Beasley said that she was unaware the victim had been having problems with her yard before the police report. Ms. Beasley stated that the victim accused her and a friend of poisoning the victim's yard at night and that the victim claimed no surveillance recordings of the pair existed because they "were sneaking behind the bushes and doing it." Ms. Beasley denied poisoning the victim's yard.

Ms. Beasley testified that the conversation with the police began because the victim accused Ms. Beasley of scratching the victim's truck in her carport. Ms. Beasley noted that the victim's carport had a surveillance camera and a light that stayed on "constantly." Ms. Beasley said that the victim "apparently had . . . damage with someone spraying" her grass. Ms. Beasley said that no further action was taken against her.

The trial court found that the victim's testimony did not bear on the victim's truthfulness and therefore did not fall under the purview of Rule 608(b). The court also found that the testimony had no probative value because it was irrelevant to the present case, that the probative value did not substantially outweigh the prejudicial effect "looking to the questionable factual situation," and that there was a potential lack of notice to the State prior to the trial.

Relative to Ms. Beasley's testimony, the trial court found that Ms. Beasley did not personally observe any of the victim's conduct and only knew the victim filed a police report. The court noted that the police did not pursue the complaint and that the allegations against Ms. Beasley were never resolved in a court. The court found that Ms. Beasley acknowledged there was damaged grass in the victim's yard, that Ms. Beasley denied killing the grass, and that the factual basis for the situation was "questionable." The court found that the probative value of the testimony did not substantially outweigh the potential prejudicial effect and that the evidence should be excluded.

Upon review of the record, we conclude that the trial court did not abuse its discretion by excluding the testimony regarding the victim's alleged false report against Ms. Beasley. Although the victim made a complaint to law enforcement about Ms. Beasley's alleged actions, the court found that the incident was never prosecuted and that only a questionable basis existed to find the victim made a false report. The victim's testimony about the prior report was not probative of the victim's character for truthfulness. We note that even if the victim made a false report, Ms. Beasley's testimony about the incident was inadmissible. Extrinsic evidence is not admissible when establishing a witness's character for truthfulness using specific instances of conduct. *See* Tenn. R. Evid. 608(b)(1). The evidence was properly excluded, and the Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE